# CRIMINAL COMPLAINT

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA <br> v. <br><br> MARIA FERNANDA ROMERO MARTINEZ, aka "Fernanda Romero,"and <br><br> KENT STUART ROSS, aka "Kent Ross." | **DOCKET NO.** <br><br> **MAGISTRATE'S CASE NO.** <br><br> FILED <br> CLERK, U.S. DISTRICT COURT <br> APR 15 2010 <br> CENTRAL DISTRICT OF CALIFORNIA <br> BY _____ DEPUTY <br><br> 10-0858M |

Complaint for violations of Title 8, United States Code § 1325(c): Marriage Fraud

| NAME OF MAGISTRATE JUDGE <br><br> **HON. CHARLES F. EICK** | UNITED STATES MAGISTRATE JUDGE | LOCATION <br><br> Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE <br><br> June 12, 2005 | PLACE OF OFFENSE <br><br> Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about June 12, 2005, in Los Angeles County, within the Central District of California, defendants MARIA FERNANDA ROMERO MARTINEZ, aka "Fernanda Romero,"and KENT STUART ROSS, aka "Kent Ross," did knowingly and unlawfully enter into marriage for the purpose of evading a provision of the immigration laws of the United States, without intending to establish a life together.

LODGED  APR 15 2010  CLERK, U.S. DISTRICT COURT  CENTRAL DIST. OF CALIF.  LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT <br><br> BONITA CANTERBERRY |
|---|---|
| | OFFICIAL TITLE <br><br> Senior Special Agent - ICE |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE <br><br> April 15, 2010 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

SAUSA:  JAMES M. LEFT     REC: DETENTION FOR ROMERO

# A F F I D A V I T

I, Bonita Canterberry, being duly sworn, hereby depose and say:

## I.

### INTRODUCTION

1.   I am a Senior Special Agent ("SSA") with the United States Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and I have been so employed since March 2003.  Previously, I was employed with the Immigration and Naturalization Service ("INS") since September 1982.  With INS, I was employed as a Special Agent ("SA") from September 1988 to March 2003, when DHS and ICE were created.  I was also employed with INS as an Examinations Officer (now called an Adjudications Officer) from September 1986 to September 1988.

2.   I am currently assigned to the Fraud Unit in Los Angeles, California, and I have been assigned to this unit since December 2004.   This unit conducts both immigration and criminal investigations relating to benefits fraud, including asylum fraud, the sale of counterfeit identification documents, and marriage fraud, which concerns aliens entering into marriages with United States citizens solely to obtain permanent resident status (commonly known as a "green card").

3.   My training has included the Criminal Investigator and Immigration Officer Academy at the Federal Law Enforcement

Training Center in Glynco, Georgia.  I have also participated in various training classes and seminars.  During my tenure as an SA and SSA with ICE and INS, I have participated in numerous investigations as a case agent or in a subsidiary role, which includes at least 100 cases concerning suspected marriage fraud. I have also debriefed defendants, informants, witnesses, and other ICE agents who had personal knowledge of different types of immigration fraud, including marriage fraud.

    4.    I make this affidavit based on personal knowledge derived from my participation in this investigation and upon reliable information from the following sources, among others:

        a.    Interviews with various witnesses in which I was a participant;

        b.    Oral and written reports about this investigations that I have received from other federal agents;

        c.    Written statements from various witnesses that were drafted in conjunction with a civil lawsuit;

        d.    Immigration records related to this case;

        e.    Various documentary evidence, including rental agreements, utility records, bank records,  and tax records.

    5.    Unless otherwise noted, wherever in this affidavit I assert that a statement was made, an SSA of ICE or another government officer provided the information and that person had

2

either direct or hearsay knowledge of the statement, and I spoke to that person or reviewed that person's report(s).

6.    Because this affidavit is being submitted for the limited purpose of supporting an application for a criminal complaint and arrest warrant, I have not set forth each and every fact learned during the course of this investigation.

7.    This affidavit is made in support of the issuance of a criminal complaint and arrest warrants against MARIA FERNANDA ROMERO MARTINEZ ("ROMERO"), also known as "Fernanda Romero," and KENT STUART ROSS ("ROSS"), also known as "Kent Ross," for violations of Title 8, United States Code, Section 1325(c) (Marriage Fraud).

## II.

## PROBABLE CAUSE

A.    OVERVIEW

8.    As described in greater detail below, ROMERO and ROSS entered into a fraudulent marriage on June 12, 2005.  ROMERO is a Mexican national who has worked as a model and actress. According to the website IMDb.com, ROMERO has appeared in several films, including "Drag Me to Hell," and "The Eye," starring Jessica Alba.  ROMERO has appeared in print and television ad campaigns for several businesses, including Rock and Republic (a high-end clothing company), Clean and Clear, Pepsi, Apple, and JC

Penny.  As mentioned further below, ROMERO has also traveled
extensively overseas, including trips to Mexico City, Vancouver,
Paris, London, Stockholm, and Istanbul, Turkey.  ROSS is a United
States citizen.  ROSS is a musician, and he has been employed at
a pizza delivery company.  Rock and Republic has employed both
ROMERO and ROSS.

  9. In connection with their entering into a fraudulent
marriage, ROMERO applied for a green card based on her marriage
to ROSS, a United States citizen.  Both of them made numerous
oral and written false statements in support of that application,
as well as a second application they filed so that ROMERO could
retain the green card she first obtained through her fraudulent
marriage to ROSS.

  10. As discussed further below, ROMERO and ROSS made
admissions to others concerning the true nature of their
marriage.  After they were married, ROSS lived as a single male
with a roommate and continued to date as if he had never been
married.  ROMERO similarly lived as an unmarried woman and
carried on with dating other men.  After their marriage, ROMERO
and ROSS also continued to live at separate residences.

  11. Throughout this affidavit, certain addresses are
mentioned.  These addresses include the actual and claimed places
of residences for both ROMERO and ROSS.  As discussed further

below, these addresses are:

      a.    "Strathmore Drive," which refers to an apartment on Strathmore Drive in Los Angeles, California.  This apartment was claimed marital residence, but ROSS never resided there.  Strathmore Drive was ROMERO's residence before the marriage and for certain periods of time after the marriage.  ROMERO also sublet this apartment during the spring and summer of 2006.

      b.    "Harold Way," which refers to an apartment on Harold Way in Los Angeles, California.  This was ROSS' residence both before and after the marriage.  From March 2005 to October 2005, ROSS lived at this residence with a male roommate.

      c.    "Warbler Way" which refers to a multi-story house on Warbler Way in Los Angeles, California.  This was ROMERO's residence from May 2006 to January 2007, and for most of this period, she lived with her boyfriend, Markus Klinko.

12.  The investigation into the fraudulent marriage between ROMERO and ROSS began after Klinko alerted immigration authorities of the fraud.  According to professionalphotographer.co.uk, Markus Klinko is a prominent fashion photographer.  Klinko and his business partner Indrani have photographed many well known celebrities, including Mariah Carey, Beyoncé, and Britney Spears.  Klinko and Indrani are also the subjects of a reality show called "Double Exposure," which

will soon air on the Bravo cable channel.

13.   In January 2007, Klinko filed a civil suit against Rock and Republic and its owner, Michael Ball, who is also a former boyfriend of ROMERO.  In the civil suit, Klinko alleged a breach of contract concerning a photo shoot that Klinko and Indrani conducted for Rock and Republic as part of its spring 2007 advertising campaign.  Klinko also accused Ball of extortion.  In connection with the civil suit, Klinko's attorney and private investigators also looked into the claim that Ball had arranged for the sham marriage between ROMERO and ROSS.  Klinko and his attorney turned over to ICE documentation and findings from their investigation, which, in turn, led to the government's investigation into ROMERO's marriage to ROSS.

B.   IMMIGRATION BENEFITS BASED UPON A MARRIAGE TO A UNITED STATES CITIZEN

14.   Based on my training and experience, I am aware of the process for obtaining permanent residence status on the basis of a marriage to a United States citizen.  To initially obtain such status, the United States citizen spouse must file a visa petition (Form I-130), and the alien spouse must file an application for adjustment of status (Form I-485).  The parties also submit Biographical Information sheets (Form G-325A), in which each party lists various biographical data, including his

6

or her name, date of birth, current address, and prior addresses.

15. Based upon my training and experience, I know that after the visa petition and adjustment application are filed, both spouses may then participate in one or more interviews with an Adjudications Officer ("AO") from U.S. Citizenship and Immigration Services ("CIS"), the government entity responsible for evaluating and granting petitions for permanent residence based upon marriages to United States citizens. The spouses may be interviewed separately or together. The AO may then decide whether to grant or deny the visa petition and the application for adjustment of status.

16. Based upon my training and experience, I know that if the United States citizen spouse and the alien spouse were married less than two years prior to a grant of adjustment of status, the alien spouse is given permanent resident status on a conditional basis. If conditional resident status is granted, within 90 days of the 2 year anniversary that such status was granted, the United States citizen spouse and the alien spouse must file a petition to remove the condition on residence (Form I-751). The parties also file additional Biographical Information sheets (Form G-325A) in connection with the petition to remove the condition on residence.

17.    Based upon my training and experience, I know that following the filing of Form I-751, CIS may require that both spouses again participate in one or more interviews with an AO. The spouses may be interviewed separately or together.    The AO may then decide to grant the application, which removes the conditional basis of permanent residence status.    The AO may also decide to deny the I-751 and place the alien in removal proceedings before the Immigration Court.    The AO may also hold his or her decision in abeyance pending further investigation of the marriage.

C.    MARRIAGE FRAUD

18.    Based upon my training and experience, I know that to determine whether a United States citizen spouse and an alien spouse engaged in marriage fraud, one must determine the intent of the both spouse at the time of their marriage.    A marriage is considered valid if the alien and her spouse intended to establish a life together at the time of their marriage ceremony. The spouses' conduct and lifestyles before and after the marriage ceremony are relevant in determining their intent.    Evidence of a valid marriage includes the listing of a spouse as an insurance beneficiary, property leases, income tax forms, and bank accounts.    Evidence of a valid marriage also includes evidence regarding the parties' courtship, wedding ceremony, honeymoon,

shared residence, and shared experiences.  The mere fact that an actual wedding ceremony and reception took place does not mean that a marriage is valid.  Evidence of a sham marriage may include contradictory or false statements concerning the parties' living arrangements, their failure to live together as husband and wife, or their dating other persons while married.  In addition, any other false statements of a spouse not directly relating to the nature of the marriage may still have an effect upon the overall credibility of that spouse.

D.  MARKUS KLINKO: ROMERO'S BOYFRIEND DURING THE MARRIAGE

19.  As the following shows, Klinko and ROMERO engaged in a romantic relationship during the time that ROMERO and ROSS attempted to create the impression that they were lawfully married.  ROMERO also made multiple admissions of marriage fraud to Klinko.

20.  On or about October 29, 2007, Klinko's attorney provided me with a memorandum from his private investigator, plus supporting exhibits.  This memorandum was generated following the investigator's conversations with Klinko.  I have reviewed this memorandum, and it states the following:

a.  On or about July 23, 2005 (which was approximately one month after the marriage of ROMERO and ROSS), Klinko met ROMERO when ROMERO attended a casting call for a photo shoot in

Los Angeles.  Two days later, Klinko and ROMERO had their first date.  From August 2005 to October 2005, Klinko and ROMERO dated when Klinko came to Los Angeles.  At that time, Klinko knew that ROMERO was living at the Strathmore Drive apartment and that she lived there with a female roommate.  During this same time period, ROMERO told Klinko that she was not involved in a relationship (even though ROMERO had recently married ROSS).  ROMERO later told Klinko that she had recently ended a long term relationship with another man (who was not ROSS).  In November 2005, ROMERO stayed with Klinko at his apartment in New York, New York.

b.    Klinko accepted more work in the Los Angeles area, and in January 2006, he moved into a residence on Queens Road in Los Angeles.  Shortly thereafter, ROMERO began spending nights with Klinko at that residence.  From time to time, Klinko stayed with Romero at the Strathmore Drive residence.  From January 2006 to July 2006, Klinko frequently traveled to New York City, and ROMERO accompanied him.  ROMERO also went with Klinko on trips to Paris and London.

c.    Sometime in March or April 2006, ROMERO told Klinko that she was married.  ROMERO admitted that she married ROSS so that she could obtain permanent residence status.  Klinko told ROMERO that many artists and models obtain non-immigrant

10

visas so that they legally work in the United States.  ROMERO

responded that committing marriage fraud was more convenient for

her.

        d.    On or about May 13, 2006, Klinko and ROMERO moved

into the Warbler Way residence.  ROMERO told Klinko that she was

"keeping" the Strathmore Drive apartment so she could continue to

create the appearance of her living with ROSS for the immigration

authorities.  During the same month, ROMERO sublet the Strathmore

Drive apartment to a woman named Manisha Manaj.

        e.    In late May 2006, Klinko saw ROMERO become

hysterical.  ROMERO had discovered that ROSS told Manaj about the

true nature of the marriage between ROMERO and ROSS (which as

discussed further below, is consistent with what Manaj told

investigating agents).  ROMERO then had a phone conversation with

Michael Ball, which Klinko overheard because the call was on a

speaker phone.  Klinko recalled hearing Ball state, "I'll

straighten him out.  Don't worry, no one can prove this."  (Based

upon my training and experience, I believe that Ball's statement

indicates that he knew about the fraudulent nature of the

marriage between ROMERO and ROSS.)

        f.    In July 2006, Klinko and ROMERO celebrated the

anniversary of their first date in the Hamptons.  In August 2006,

Klinko and ROMERO stayed at the Surf and Sand Resort and Spa in

11

Laguna Beach, California.  During October and November 2006, Klinko and ROMERO resided together at the Warbler Way residence and at Klinko's apartment in New York City.  By January 2007, ROMERO had ended the relationship.

21.  On or about November 3, 2008, Assistant United States Attorney ("AUSA") Jeff Mitchell and I interviewed Markus Klinko regarding his relationship with ROMERO.  Klinko was aware of the memorandum provided to me on or about October 29, 2007, and Klinko confirmed that all the information in the memorandum was correct.  During this interview, Klinko also provided the following additional information:

a.  ROMERO told Klinko that she possessed photographs of ROMERO and ROSS that were staged.

b.  ROMERO told Klinko that ROMERO and ROSS rehearsed their answers before having their interviews with the immigration authorities, discussed further below.

22.  On or about December 10, 2008, I interviewed James Foreman at his place of business, and Foreman told me the following:

a.  Foreman is a realtor in West Hollywood, and he was an agent for Klinko.

b.  Foreman helped Klinko find a residence in the Los Angeles area in January 2006, which was the Queens Road

12

residence.

        c.    In May 2006, Klinko wanted to move to another residence, and Klinko contacted Foreman for assistance.

        d.    Foreman met Klinko and ROMERO at the Queens Road residence, and to Foreman, ROMERO appeared to be Klinko's girlfriend.

        e.    In May 2006, Klinko moved to the Warbler Way residence.  Foreman later saw ROMERO with Klinko at that residence.

        f.    Klinko moved out of the Warbler Way residence in December 2006, but ROMERO continued to live there.

        g.    In January 2007, the owner of the Warbler Way residence had to take measures to evict ROMERO from the property.

23.  On or about January 18, 2010, I conducted a telephonic interview with Karin McWhorter.  McWhorter told me that she was a former employee of Klinko and that she worked for Klinko for about one year.  McWhorter stated that she was aware of the romantic relationship between Klinko and ROMERO, and that McWhorter had seen them together as a couple.

24.  I have received and reviewed bank statements related to two Washington Mutual checking accounts, one ending in 435-1 and the other ending in 434-3, both of which were opened solely in the name of ROMERO.  These statements reflect that from March

13

2006 to November 2006, ROMERO made check card charges in both the Los Angeles area and the New York City area, which is consistent with Klinko's statement that ROMERO traveled with Klinko when Klinko went to New York during that time period.  These statements also indicate that from July 2006 to March 2008, ROMERO made check card charges in Mexico City, Vancouver, Stockholm, and Istanbul, Turkey.

E.    MANISHA MANAJ:  ROMERO'S SUBLETTOR AT THE STRATHMORE DRIVE APARTMENT

25.    On or about November 6, 2007, I had a telephonic interview with Manisha Manaj, who told me the following:

a.    In May 2006, Manaj sublet the Strathmore Drive apartment from ROMERO.

b.    Shortly thereafter, Manaj met ROSS at a local bar/restaurant, and they started up a conversation.

c.    During their conversation, ROSS told Manaj that ROMERO paid ROSS $5000 to marry her so that she could obtain immigration status in the United States.

d.    ROSS also told Manaj he had a temporary arrangement to appear as though ROSS and ROMERO were living together in case any immigration authorities came to the Strathmore Drive apartment to investigate the nature of the marriage.

14

26.  On or about January 15, 2010, Special Assistant United States Attorney ("SAUSA") James M. Left and I again spoke with Manaj.  Manaj confirmed her statements of November 6, 2007, and also stated the following:

a.  During their conversation at the bar/restaurant, ROSS claimed that he lived at the Strathmore Drive apartment for a short period of time prior to Manaj moving into the residence. (Based upon the totality of the investigation into this case, I believe that ROSS never resided at the Strathmore Drive residence.)

b.  It was clear from ROSS' statements that the marriage was a sham.

c.  After the marriage ceremony, ROSS attempted to establish a romantic relationship with ROMERO, but ultimately, it did not work out.

d.  ROSS appeared angry due to the manner in which ROMERO treated him.

e.  When Manaj moved into the Strathmore Drive apartment, she noticed photos depicting ROMERO and ROSS together. This struck her as odd because she knew that ROMERO was dating Markus Klinko.  However, after her conversation with ROSS, Manaj concluded that the photos of ROMERO and ROSS were staged to create the appearance of a legitimate relationship.

15

       f.    After the conversation with ROSS in May 2006, Manaj only saw ROSS one other time, when he came to the Strathmore Drive apartment to pick up some mail.

       g.    Manaj resided in the Strathmore Drive apartment for only three months, and she believed that sometime thereafter, ROMERO moved back into the apartment.

F.   <u>CYNTHIA PINOT GONZALEZ:  ROMERO'S FORMER FRIEND</u>

    27.   As part of Markus Klinko's litigation against Michael Ball and Rock and Republic Enterprises, Cynthia Pinot Gonzalez provided an affidavit, dated February 21, 2007.  I have reviewed a copy of this affidavit in which Pinot stated the following:

       a.    Pinot had known ROMERO since 2002, and she was previously close friends with ROMERO.

       b.    It was common knowledge among Pinot's friends and associates that the marriage between ROMERO and ROSS was a sham and that ROMERO said Ball arranged it.

       c.    ROMERO specifically told Pinot about Ball's assistance and Ball's introduction of ROMERO to ROSS.

       d.    ROMERO also told Pinot that ROMERO paid ROSS to marry her.

    28.   On or about July 18, 2008, ICE SA Jason Canty and I interviewed Pinot, who told us the following:

a.    Pinot met ROMERO when they both worked at a high-end clothing store sometime in 2003 or 2004.

b.    ROMERO told Pinot that Ball introduced ROMERO to ROSS.  Pinot also stated that the true nature of their marriage was "commonly known."

c.    ROMERO told Pinot that for agreeing to marry her, ROMERO paid ROSS in installments.

d.    During one phone conversation, ROMERO said to Pinot that ROMERO had to go to the bank to withdraw some money to pay ROSS.

G.    <u>MELODY ROSS:  ROSS' MOTHER</u>

29.    On or about December 18, 2008, ICE SA Chad Heisel, SAUSA Sandra Shin, and I interviewed Melody Ross, the mother of ROSS, at her home in Salt Lake City, Utah.  Melody Ross told us the following:

a.    Melody Ross had a very close relationship with both of her sons, including ROSS.

b.    Melody Ross spoke with ROSS by telephone on a daily basis, sometimes multiple times per day.

c.    Melody Ross thought that both her sons were single (even though ROSS married ROMERO over three years beforehand).

d.    Melody Ross thought ROMERO was a friend of ROSS who had worked as an actress, but Melody Ross did not think that

17

ROMERO was ROSS' girlfriend.

      e.    Melody Ross had ROMERO's address in her address book, which was listed as the Strathmore Drive residence.

      f.    Melody Ross did not think that ROSS and ROMERO had ever lived together.

      g.    Melody Ross' address book listed ROSS' address as the Harold Way apartment, where she believed that ROSS had lived for the past four years or longer (which includes before and after ROSS' marriage to ROMERO on June 12, 2005).

H.    BRIAN DARR:  ROSS' ROOMMATE DURING THE MARRIAGE

    30.   On or about January 27, 2010, SAUSA Left and SA Canty interviewed Brian Darr, who was ROSS' roommate during his marriage to ROMERO.  SA Canty drafted a Report of Investigation ("ROI") concerning this interview, and I have reviewed it.  The ROI states the following:

      a.    Darr lived in the Los Angeles area from June 2002 to December 2005.  In July 2002, Darr met ROSS at their place of employment, Z Pizza, a pizza delivery company.  Darr and ROSS did not become friends, but they moved into the Harold Way apartment in March 2005.  Darr moved out in October 2005.

      b.    Darr confirmed that ROSS lived at the apartment from March 2005 to October 2005 (which encompasses the time period after ROMERO married ROSS on June 12, 2005), but they did

not see each other every day.  ROSS managed a Z Pizza store in

Long Beach, and ROSS sometimes stayed overnight in Long Beach

with a female companion.  (As discussed throughout this

affidavit, ROMERO lived in the apartment on Strathmore Drive,

which is in the Westwood area of Los Angeles.  ROMERO also lived

at the Warbler Way residence, which is in the Hollywood Hills

area of Los Angeles.)

         c.   ROSS brought various women to the Harold Way

apartment from time to time.

         d.   ROSS never mentioned to Darr that he was married

or that he was in a relationship with an aspiring actress or

model.

         e.   Prior to being contacted in January 2010 in

connection with the investigation of this case, Darr had never

heard of ROMERO.

         f.   After Darr learned about ROMERO, Darr found her

photograph on the Internet.  Darr was certain that he had never

seen ROMERO beforehand.

I.   INVESTIGATION INTO THE STRATHMORE DRIVE APARTMENT

   31.  As part of my investigation into the marriage between

ROMERO and ROSS, I obtained copies of two lease agreements

concerning the Strathmore Drive residence.  The first lease

agreement states that ROMERO and a woman named Manola Salustri

19

rented the Strathmore Drive apartment beginning May 1, 2003.  The lease agreement also lists the property manager as Sonja Templeton.  The second lease agreement lists ROMERO and ROSS as the tenants of Strathmore Drive apartment beginning July 1, 2005. Templeton is again listed as the property manager.  (Based upon my training and experience, I know that couples entering into a fraudulent marriage will purposefully enter into certain obligations, such as joint lease agreements, joint bank accounts, or utility bills, so that they can submit such documents to CIS as purported evidence of a valid marriage and life together.)

32.  On or about October 9, 2007, ICE SA Leah Guerrero and I interviewed Templeton, who was the on-site property manager of the apartment complex containing the Strathmore Drive apartment and the next door neighbor of ROMERO.  Templeton stated the following:

a.  Although ROSS was on the lease, she had seen ROSS at the Strathmore residence on only two occasions.  The second occasion occurred one week before the interview of October 9, 2007, when Templeton saw ROSS sitting on the steps in front of the property.

b.  Templeton was aware that ROMERO sublet her apartment to Manisha Manaj during the summer of 2006.

20

J.    INVESTIGATION INTO THE HAROLD WAY APARTMENT

33.    As part of my investigation into the marriage between ROMERO and ROSS, I obtained a copy of a lease agreement concerning the Harold Way residence.  The lease agreement states that ROSS and Brian Darr signed the rental agreement and that it was effective from March 1, 2005, to February 28, 2006.

34.    On or about March 21, 2008, ICE SA Wanda Roper and I interviewed Luis Arreaga, the property manager for the apartment building that includes the Harold Way residence.  Arreaga stated the following:

a.    Arreaga had been the property manager for the building on Harold Way for the past four years.

b.    Arreaga rented the Harold Way apartment to ROSS and Brian Darr about three years prior to the interview.

c.    Darr only lived at the Harold Way residence for a short period of time, and ROSS still resided there (as of March 2008).

d.    After being shown a photograph of ROMERO, Arreaga stated that he had not seen ROMERO at ROSS' apartment.

35.    On or about January 30, 2010, SSA Frank Mendiola and I interviewed Arreaga a second time.  During this second interview, Arreaga stated the following:

21

a.    Arreaga stated that he used to be the apartment manager for the building containing the Harold Way apartment.

b.    Arreaga was present at the building on a daily basis to keep it clean, change locks, remove any graffiti, and collect the rent.

c.    Arreaga frequently saw ROSS at the building. Arreaga also remembered that ROSS paid the rent by money order and that he was usually late on his rent payments.

d.    Arreaga sometimes saw ROSS with women who had a punk rock appearance, including pink or green hair. Arreaga's description of these women does not match the appearance of ROMERO.

K.    THE "BED CHECKS" AT STRATHMORE DRIVE AND HAROLD WAY

36.    On October 2, 2007, ICE SSA Bruce Kamei and I visited the Strathmore Drive and Harold Way apartments. Based upon my training and experience, I know that it is a common practice for ICE agents to make visits to the claimed residence and actual residences of an alien spouse and a United States citizen spouse who are suspected of engaging in marriage fraud. These types of visits are commonly known as "bed checks." Such visits assist in determining whether the spouses actually reside together.

37.    On October 2, 2007, SSA Kamei and I first went to the apartment on Strathmore Drive, the claimed residence of ROMERO

22

and ROSS.  ROMERO answered the door and escorted SSA Kamei and I
around her apartment.  Several photographs were affixed to the
refrigerator door, but there were no photographs of ROSS.  The
master bedroom contained other photographs, none of which
depicted ROSS.  There was also no evidence (such as male articles
of clothing or toiletries for men) that any male, including ROSS,
resided at the Strathmore Drive apartment.

38.  While at the apartment, ROMERO acted as if she was
crying and claimed that she and ROSS were not getting along.
After I asked ROMERO whether she was an actress, ROMERO responded
"yes," and her crying immediately ceased.  It appeared to me that
ROMERO's crying was merely an act as part of an effort to conceal
the true nature of her marriage to ROSS.

39.  The same day, SSA Kamei and I then proceeded to the
apartment on Harold Way.  ROSS invited us into the apartment, and
we observed the presence of two other adult males.  ROSS allowed
SSA Kamei and I to look around the apartment.  There were some
pictures present, but none depicted ROMERO.  There was also no
evidence (such as female articles of clothing or toiletries for
women) that any female resided at the Harold Way apartment.

L.   THE IMMIGRATION APPLICATIONS FILED ON BEHALF OF ROMERO

40.  Based on my training and experience, I know that a DHS
Alien File or "A-File" is a file in which immigration records are

maintained for aliens admitted to or found in the United States. If an alien applies for some type of immigration benefit, such a visa petition, an application for permanent resident status, or a joint petition to remove the condition on residence status, the application and supporting documentation would appear in the A-file.

41.  I reviewed DHS A-File Number A096-579-216, which is maintained for ROMERO, and I have a copy of the A-file.  The A-file contains a Petition for Alien Relative (Form I-130) filed by ROSS on behalf of ROMERO on or about July 15, 2005.  On this petition, ROSS lists his address and ROMERO's address as the Strathmore Drive residence.  At the same time, ROSS submitted a Biographical Information Sheet (Form G-325A), in which ROSS stated, among other things, that he had resided at the Strathmore Drive residence since May 2005.

42.  ROMERO's A-file also contained an application for adjustment of status (Form I-485), which ROMERO filed on or about July 15, 2005.  Among other things, ROMERO listed her address as the Strathmore Drive residence.  In response to the question "Have you ever, in or outside of the United States, knowingly committed any crime involving moral turpitude or drug related offense for which you had not been arrested?" ROMERO checked the box for "no."  Based upon my training and experience, I know that

24

committing marriage fraud involves moral turpitude and includes making false statements in applications for permanent residence.

43.    ROMERO also submitted a Biographical Information sheet (Form G-325A) dated June 29, 2005, in which she claimed that she resided in Mexico from September 1989 to April 2005, which was a false statement for the following reasons:

a.    On June 4, 2008, Ciudad Los Angeles, an Internet based magazine, published an article concerning an interview with ROMERO.  I have obtained a copy of this article and have reviewed it.  The article states that ROMERO moved to Los Angeles when she was 18 years old.  According to documents ROMERO submitted to CIS and contained in ROMERO's A-file, ROMERO was born in 1981.  Thus, by her own admission, ROMERO moved to Los Angeles around 1999, well before April 2005, as listed on her G-325A.

b.    I have reviewed the Central Index System database ("CIS database") to ascertain when ROMERO entered into and departed from the United States.  Based upon my training and experience, I know that the CIS database contains immigration records concerning aliens, including the granting of any immigration status, entries into the United States, and departures from the United States.  The CIS database indicates that ROMERO made at least 26 entries into the United States, the first occurring on August 25, 2000, and the last occurring on

January 17, 2010.  Seven of these entries occurred prior to April

2005.  These records clearly indicate that ROMERO resided in the

United States well before April 2005.

        c.   I have also obtained and reviewed transcripts from

Santa Monica College concerning ROMERO.  These records state that

ROMERO enrolled in classes at Santa Monica College from the fall

of 2000 to the spring of 2004.

        d.   I have obtained and reviewed documents from the

UCLA Cooperative Housing Association, which provides housing for

the students of UCLA and Santa Monica College.  These records

indicate that ROMERO resided at their facility in Los Angeles

from February 28, 2002, to April 1, 2003.

        e.   As previously discussed, ROMERO and her roommate

Manola Salustri entered into a rental agreement for the

Strathmore Drive apartment beginning May 1, 2003.

    44.  Along with the I-130 and I-485, ROMERO and ROSS

submitted several other documents to CIS as purported evidence of

their valid marriage, but notably other documents typically

indicative of a valid marriage were missing.  Specifically,

ROMERO and ROSS submitted no evidence that they had dated at all

prior to the marriage.  Such evidence could have included

correspondence between the parties and any photographs showing

any shared experiences.  ROMERO and ROSS instead only submitted

26

one photograph of them together with a dog.  Based upon my
training and experience, this lack of evidence is consistent with
marriage fraud.

45.  ROMERO and ROSS submitted a copy of a marriage
certificate, stating that ROMERO and ROSS were married on June
12, 2005.  ROMERO and ROSS only submitted one photograph from
their wedding, which depicts only ROMERO and ROSS.  Thus, there
is no evidence that others attended the wedding.  ROMERO and ROSS
also submitted no evidence that they went on a honeymoon.  Based
upon my training and experience, the lack of attendees at the
wedding and the lack of a honeymoon is also consistent with
marriage fraud.

46.  In support of the I-130 and I-485, ROMERO and ROSS
submitted several documents in an attempt to show that they
resided together.  These documents included the first page of the
rental agreement for the Strathmore Drive residence for both
ROMERO and ROSS, a City of Los Angeles Municipal Services bill,
dated October 17, 2005, which lists both their names, and the Gas
Company bill, listing Ross' name at the Strathmore residence.
These documents also included a letter from State Farm, dated
August 30, 2005, stating that ROSS had been added to ROMERO's
auto insurance policy, and the first page of a statement from
Bank of America concerning a joint checking account ending in

27

3210, for the period July 14 to August 15, 2005.

47. Based upon my training and experience, I know that individuals who engage in marriage fraud typically submit documentation to CIS that contains the names of both spouses. Such documentation is easy to produce because utilities, insurance companies, and banks do not investigate the nature of the marriage. I also know that individuals who engage in marriage fraud often forget to provide the address of the alleged marital residence to other parties. These same individuals will also change their mailing address back to their correct addresses after a short period of time. This occurs because the fake spouse becomes tired of traveling to another address to pick up his or her mail. Both types of documentation were found in the instant case, as discussed below.

48. After a CIS Adjudications Officer ("AO") conducted interviews of both ROMERO and ROSS under oath, CIS approved the I-130 visa petition and the I-485 adjustment application on January 17, 2006. Thus, ROMERO became a permanent resident on a conditional basis. However, the totality of this investigation indicates that the marriage was not valid. As I know from my training and experience, if all this information had been known to the AO, the visa petition and the adjustment application would have been denied.

28

49. The DHS A-file for ROMERO also contains Form I-751, Petition to Remove Conditions on Residence, which Romero filed on January 17, 2008. This document contains the signatures of both ROMERO and ROSS. On this application, ROMERO's address was listed as the Strathmore Drive residence, and ROSS' address was listed as the Harold Way residence.

50. In support of this petition, ROMERO and ROSS submitted a copy of their federal and state joint income tax returns for 2005. These returns list their address as the Harold Way residence, but in all other instances, ROMERO and ROSS claimed that the Strathmore Drive residence was their marital residence. ROMERO and ROSS also submitted a copy of their joint federal income tax return for 2006, which includes Schedule C. The first page of the return lists the Strathmore Drive residence, and the Schedule C form lists ROMERO's business address as the Harold Way apartment. ROMERO and ROSS also submitted a copy of their state joint tax return for 2006, which lists their address as the Harold Way residence. Based upon my training and experience, this confusion as to where ROMERO and ROSS resided is another indication that they never actually lived together.

51. ROMERO also submitted a Biographical Information sheet (Form G-325A), dated December 23, 2007, in which she claimed that she had resided at the Strathmore Drive residence since April

29

2005. This was a false statement because ROMERO started to reside there on a much earlier date, and she had lived with Markus Klinko at the Warbler Way residence, as reflected above. In the Form G-325A, ROMERO also stated that she resided in Mexico from September 1989 to April 2005, which was also a false statement, as discussed above.

52. ROSS also submitted a Biographical Information sheet (Form G-325A), dated December 23, 2007, in which he claimed that he had resided at the Strathmore Drive residence from April 2005 to July 2006, even though he never resided there. ROSS also stated that he had resided at the Harold Way residence since February 2005.

53. On or about December 19, 2007, CIS Senior Adjudications Officer ("SAO") Dan Clippinger interviewed ROMERO and ROSS because CIS suspected that ROMERO and ROSS had engaged in marriage fraud. SAO Clippinger interviewed ROMERO and ROSS separately and under oath. ROMERO and ROSS also signed Records of Sworn Statement in Administrative Proceedings (Form I-877) following each interview. The Records of Sworn Statements and SAO Clippinger's notes regarding the interviews are contained in the A-file for ROMERO. I have reviewed these documents, which state the following:

a.   During the interviews, ROMERO and ROSS provided several statements that were consistent with the other person's statements.  However, there were some answers that indicated ROMERO and ROSS engaged in marriage fraud.  Specifically, ROMERO was asked if she was known by any other names, and she replied "Marifer" and "Mafer," but ROSS was not aware of these nicknames. ROSS stated that he had only seen ROMERO's mother only once since the wedding of ROMERO and ROSS.  However, ROMERO stated that ROSS and her mother were together quite frequently.

b.   When initially asked where he resided, ROSS stated that he lived at the Strathmore Drive address (even though SSA Kamei and I saw ROSS residing at the Harold Way residence only 2½ months beforehand).  Upon further questioning, ROSS stated that he lived at the Harold Way residence.  ROSS also stated that he had maintained the Harold Way residence for the past three years, which included time before the date of the marriage.  (Based upon my training and experience, I know that a husband and wife maintaining separate residences within the same geographical area is a clear indication that the parties did not intend to establish a life together.)

c.   During the interviews, ROMERO and ROSS stated that they had been separated for about one year, which would have been on or about December 2006.  However, as discussed below, ROMERO

31

and ROSS reported separate addresses to various parties well before December 2006.

M.   BANK ACCOUNT RECORDS

54.   During the course of my investigation into this case, I discovered that ROMERO and ROSS have maintained several different checking and savings accounts with multiple banks in addition to the Bank of America checking account, mentioned above.   In particular, I have received and reviewed Washington Mutual bank statements and account applications for multiple accounts under the names of ROMERO and ROSS.

55.   On June 13, 2005, the day after their wedding, ROMERO and ROSS opened a Washington Mutual checking account ending in 072-9 and a saving account ending in 212-4.   Both accounts were listed as "joint account with right of survivorship," and both accounts were closed on December 13, 2005.   Also on December 13, 2005, ROMERO opened two Washington Mutual checking accounts ending in 434-3 and in 435-1.   These accounts were opened as "single account in my name."   On the same date, ROMERO opened two Washington Mutual savings accounts ending in 764-7 and 765-5, which were also "single account in my name."

56.   Based upon my training and experience, it appears to me that the joint accounts were opened with Washington Mutual solely to create the appearance that ROMERO and ROSS intended to

32

establish a life together.  Once ROMERO decided that these joint accounts were no longer needed to create this appearance, ROMERO closed these accounts.

57.  I have also received and reviewed bank statements and cancelled checks related to a Well Fargo account ending in 1037 for ROSS.  The documentation related to this account shows that ROSS opened the account on June 29, 2005 in his name only.  Based upon my training and experience, the listing of only ROSS on a new account, which was opened within weeks of the marriage, is an indication that ROSS did not intend to establish a life together with ROMERO and that ROSS only intended to use the Strathmore Drive address for "immigration purposes."  (In his Wells Fargo application, ROSS claimed that he had resided at the Strathmore Drive residence for the past five years and three months, which was clearly inaccurate.)

58.  The documentation from Wells Fargo also shows that in October 2005 and in November 2005, Z Pizza mailed checks for ROSS to the Strathmore Drive address.  However, in February 2006, a company called "Team Music" sent a check for ROSS to the Harold Way residence.  Beginning in May 2006, bank statements were sent to ROSS at the Harold Way residence.  Based upon my training and experience, the change in address for ROSS reflects a pattern among marriage fraud cases in which individuals will change their

mailing address from the claimed marital residences to their
actual residences.

N.    <u>DMV RECORDS</u>

59.    I have accessed the database for the California
Department of Motor Vehicles ("DMV") to access driver's license
information concerning ROMERO and ROSS.  According to the DMV
database, ROMERO renewed her California Driver's License on May
30, 2006, and she listed her address as the Strathmore Drive
apartment, even though at that time, ROMERO was residing with
Klinko at the Warbler Way residence.

60.    According to the DMV database, ROSS renewed his
California Driver's License on October 16, 2006.  ROSS listed his
address as the Harold Way apartment, even though the alleged
marital residence was the Strathmore Drive apartment.  In fact,
according to the DMV database, ROSS never informed the DMV that
he resided at the Strathmore Drive residence.

III.

**CONCLUSION**

61.    Based on the information provided above, there is probable cause to believe that MARIA FERNANDA ROMERO MARTINEZ and KENT STUART ROSS have committed violations of Title 8, United States Code, Section 1325(c) (Marriage Fraud).  I therefore request that the Court issue the requested criminal complaint and arrest warrants.

Bonita Canterberry
Senior Special Agent, ICE

Subscribed to and sworn to before me
this /5th day of March 2010.

UNITED STATES MAGISTRATE JUDGE

35